UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Dixie N. Hiter,
  Plaintiff     )
           )
   v.       )  Case No. 11-1282
           )
Multiband EC Inc.    )
  Defendant     )
           )

**OPINION AND ORDER**

Now before the Court is the Defendant's motion for summary judgment (#17). The motion is fully briefed, and I have carefully considered the arguments and evidence submitted by the parties. As stated herein, the motion is denied.

Also before the Court is Plaintiff's motion (#24) to amend her response to the motion. That motion is GRANTED, and the Clerk is directed to file the amended Response attached to this motion. This Opinion and Order is based on the amended Response.

I. JURISDICTION AND VENUE

This case arises under 42 USC §2000e-3. This Court therefore has jurisdiction over the subject matter of the case, because it presents a federal question. 28 USC §1331.

Venue is appropriate because the underlying incidents occurred at Defendant's facility in Bloomington, Illinois, within the Peoria Division of the Central District of Illinois.

II. SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd v Zenith Radio Corp.*, 475 US 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if the movant establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. FRCP 54(c); see also *Jay v Intermet Wagner Inc.*, 233 F3d 1014, 1016 (7th Cir

2000); *Cox v Acme Health Services*, 55 F3d 1304, 1308 (7th Cir 1995). If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. *Hedberg v. Indiana Bell Tel. Co.*, 47 F3d 928, 931 (7th Cir 1995), citing *Anderson v Liberty Lobby, Inc*, 477 US 242, 248 (1986).

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, *Erdman v City of Ft. Atkinson*, 84 F3d 960, 961 (7th Cir 1996); *Vukadinovich v Board of School Trustees*, 978 F2d 403, 408 (7th Cir 1992), cert denied 510 US 844 (1993); *Lohorn v Michal*, 913 F2d 327, 331 (7th Cir 1990); *DeValk Lincoln-Mercury, Inc. v Ford Motor Co*, 811 F2d 326, 329 (7th Cir 1987); *Bartman v Allis Chalmers Corp*, 799 F2d 311, 312 (7th Cir 1986), cert denied, 479 US 1092 (1987), and construing any doubts against the moving party. *Adickes v S. H. Kress & Co.*, 398 US 144 (1970); *Trotter v Anderson*, 417 F2d 1191 (7th Cir 1969); *Haefling v United Parcel Service, Inc*, 169 F3d 494, 497 (7th Cir 1999).

The initial burden is on the movant to identify evidence that demonstrates the absence of a genuine issue of material fact. FRCP 56(a); *Celotex Corp. v Catrett*, 477 US 317, 323 (1986), quoted in *Logan v. Commercial Union Insurance Co.*, 96 F3d 971, 978 (7th Cir. 1996). Once that burden has been met, a non-movant's assertion that genuine issues of fact exist must be supported by evidence in the record, FRCP 56(c)(1). See also, *First Nat'l Bank of Arizona v Cities Service Co.*, 391 US 253, 290 (1968)(requiring "significant probative evidence"); *Matsushita*, 475 US at 586 (when the moving party has met its burden, non-moving party must do more than show some "metaphysical doubt " as to material facts). If the non-moving party is unable to produce evidence in support of an essential element of her case sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. *Celotex*, 477 US at 322 ("a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."); *Waldridge v American Hoechst Corp.*, 24 F3d 918, 920 (7th Cir 1994).

A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 US at 250; see also, *Piscione v. Ernst & Young, L.L.P.*, 171 F3d 527, 532 (7th Cir.1999) (The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact.)

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson*, 477 US 242. Likewise, summary judgment is not a substitute for a jury's determination about credibility. *Paz v Wauconda Healthcare and Rehabilitations Centre*, 464 F3d 659, 664 (7th Cir 2006). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. *Waldridge*, 24 F3d at 922. The court has one task and one task only: to decide based on the evidence of record, whether there is any material dispute of fact that requires a trial.

Where facts are undisputed but the inferences that may fairly be drawn from those facts are disputed, summary judgment must be denied. See, for example, *Harley-Davidson Motor Co. v PowerSports, Inc.*, 319 F3d 973, 989 (7th Cir 2003)("summary judgment is not appropriate if the court must make a choice of inferences" from undisputed facts). That said, however, "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v Village of Winnetka*, 371 F3d 992, 1001 (7th Cir 2004).

III. UNDISPUTED FACTS

The following statement of facts is taken from the Defendant's statement of facts and Plaintiff's response[1] thereto, as well as the evidentiary support cited by the parties.

Plaintiff Dixie N. Hiter filed this lawsuit against her former employer, Multiband EC Inc[2]. Her initial complaint included two claims: sex discrimination and termination of employment in retaliation for opposing an unlawful employment practice or participating in an investigation under Title VII in violation of 42 USC §2000e-3 and 775 ILCS 6/6-101. Plaintiff subsequently agreed to dismiss the sex discrimination claim[3], leaving only her retaliation claim.

Multiband installs and repairs DirecTV satellite digital television systems. It operates multiple warehouses in the Midwest, including the one at which Hiter worked in Bloomington, Illinois. Hiter was hired in June 2005 as a "tracker/dispatcher." She was promoted, several times, eventually assuming the position of Warehouse Manager as of December 8, 2009. Multiband provided management training to Hiter, including sending her to Disney Leadership Training. She also received a copy of Multiband's Associate Handbook and had reviewed it a number of times. She was aware that it contained a policy against discrimination and harassment and that it prohibited retaliation. She also knew the procedure for reporting violations of any of these policies.

As the Warehouse Manager, Hiter was responsible for everything that happened at and in the warehouse. Her immediate supervisor was Craig Kretkowski, the Market Manager at the Bloomington facility. As is pertinent here, Hiter's subordinate employees were Tanya

---

[1] Plaintiff did not respond to paragraphs 16 and 17 in the Defendant's Statement of Undisputed Facts. Where a non-movant fails to controvert factual averments set forth in the movant's statement, it is construed as a concession of the movant's version of those facts. See, *Waldridge v. American Hoechst Corp.*, 24 F3d 918, 922 (7th Cir.1994).
[2] Plaintiff was initially hired by Multiband's predecessor, Bluegrass Satellite. For purposes of this litigation, the change is inconsequential. Her employer will be referred to as Multiband throughout this Opinion and Order.
[3] See Joint Stipulation, Doc.#16, Sept. 17, 2012.

Edwards[4], Matthew Silverman, Eric George and Layla Roberts. Hiter was a management employee; her subordinates were union members.

Hiter testified that as a general rule she had authority to discipline her subordinate employees, at least to a point, but that to write up an employee she had to go to Kretkowski. (Hiter dep. p. 61). How that statement applied specifically to Tanya Edwards is less than clear. Multiband had previously fired Edwards after Hiter complained that she had falsified inventory numbers. The union arbitrated her termination and, as a result, she was rehired. Following Edwards' return, Hiter testified[5] that Lisa McCreight (Director of Human Resources) met with her and Kretkowski on January 20, 2011. Hiter testified that she was told by Lisa McCreight to document Edwards' conduct, but that she was not to approach Edwards regarding disciplinary matters on her own. (Hiter dep p. 127-8).

McCreight's recollection of the meeting is different. McCreight testified that she gave Hiter specific advice, telling her to sit down with Edwards and discuss any issues directly with her. She also testified that Hiter was told that, if Edwards violated any company policy, she should be written up and disciplined. She testified that Hiter understood that she would be expected to improve her management of warehouse employees, including Edwards. At the conclusion of this meeting, McCreight made notes that concluded: "

> My observation is that neither Craig (Kretkowski) nor Dixie (Hiter) are leaders and that is causing the bulk of the issues as they are not capable of shutting down petty issues as they arise causing these same issues to fester, creating an uncomfortable environment for the rest of the employees."

On January 27, 2011, Hiter sent an email to Kretkowski. The pertinent portion of the email read *verbatim* as follows:

---

[4] Tanya Edwards is also referred to in some of the documents as Tanya Thompson. She is referred to herein as Edwards.

[5] In Plaintiff's response to Defendant's Statement of Material Facts ¶9, Plaintiff asserts that any discipline of Edwards had to be approved by HR, suggesting that this was part of the arbitration agreement. She cites to no authority for that proposition, referring the Court to her response to ¶39. There is nothing in ¶39 about Hiter's authority to discipline her subordinate employees. In general or Edwards in particular.

> Layla called me last night to tell me that when Tanya got off work she called her and said she thought I was sleeping with [another Multiband employee] because I was flirting with him all morning etc. Normally I would not be telling you this but every week she tells someone that I'm sleeping with someone and its getting really old. I would prefer it if Tanya did not know that Layla told me because that would start a whole new war I would have to deal with it.
>
> Layla also told me that Tanya stated she was working with a lawyer to sue the company for harassment and slandering her name. With that being said I will document every time something here is said but just thought you may want to know so you can keep this on file.

On February 1, 2011, Silverman sent a lengthy (2-1/2 page, single spaced) email to Hiter, copying Kretkowski. The subject line of the email read "A formal complaint." In the email, Silverman complained about the conduct of Edwards and Roberts in the workplace, focusing primarily on Edwards. He mentioned such things as lewd comments, discussions of their personal lives and references to "bedside" matters, shameless flirting, sexually-related conversations about things Edwards would like to do, and other unprofessional conduct in the warehouse. He also related Edward's apparent efforts to undermine Hiter's and Kretkowski's "role as our immediate management." He reported that she went behind their backs to other supervisors or tried to assume control of the warehouse whenever Hiter and Kretkowski were absent. He gave examples of unprofessional outbursts and what he termed "harassment" by Edwards. He stated his belief that Edwards and Roberts had "teamed up" and become troublemakers. He summarized their conduct as "high school drama." Hiter forwarded Silverman's email to Joe Yuncker (Regional Inventory Manager) and Lisa McCreight on February 2, 2011, without comment.

On January 31, 2011, Tanya Edwards took a break without express approval from Hiter. Apparently Hiter was on the phone and Edwards simply waved her arm in the door and said she was going. Hiter and Kretkowski believed that this was contrary to their rule that all personnel must notify their supervisor before going on break, and they inquired of the Regional Human Resources Manager, Edna Vice, how to go about doing a Disciplinary

6

Memo ("DM") for this incident. Vice suggested a Coaching Memo instead, but directed that, before it was given to Edwards, it be approved by her. On February 1, Kretkowski sent a Coaching Memo to Vice, but Vice did not approve it, sending it back with questions and comments, seeking "clarification."

Also on February 1, 2011, Hiter received a handwritten letter from Layla Roberts. In that letter, Roberts complained that someone in the union had given information about her to Tanya Edwards. She stated that Tanya and the union were making the workplace a hostile environment and that she should not "have to feel this way." Hiter sent a copy of Roberts' letter to Edna Vice, again without comment.

On February 5, 2011, Lisa McCreight sent a memo to Multiband management members, attaching her notes from the January 20 meeting between her and the Bloomington warehouse employees. In her memo she stated: "At this time I am planning to go to Bloomington on Wednesday February 9th and proceed with termination for Craig Kretkowksi and Dixie Hiter." McCreight testified at her deposition that she had made the decision to terminate Hiter before Hiter had sent any one of the 3 documents mentioned above.

The record includes a memo dated February 8, 2011 from Joe Yuncker. The memo criticizes Hiter without naming her, noting:

> It is the Inventory Managers [sic] responsibility to do weekly and month end warehouse counts of every item…For the past six months Bloomington has had the largest number of discrepancies for the NC region…Of the NC region, Bloomington has the highest number of warehouse personal [sic] vs technicians and should have plenty of time in the day to pull the orders and verify accuracy."

The memo does not state to whom it was circulated.

On February 9, Hiter's employment with Multiband was terminated. On the Notice of Termination, two boxes were checked under "Reason for Separation – Discharged (Involuntary)." Those boxes were "Not Meeting Required Performance Standards (Give

7

specifics below.)" and "Other (Explain below.)". In the section below marked "Explanation" was written, "Multiband's expectations require a more positive leadership role. The attached emails demonstrates [sic] that your leadership does not meet Multiband's expectations." Attached were copies of the email chain arising from Silverman's 2/1 email; and the 2/8 "memo" from Joe Yuncker regarding inventory discrepancies.

Hiter did not know until sometime during this litigation that, beginning in November of 2010, Tanya Edwards had communicated several times directly with Multiband's Vice President Don Snyder and/or with other Multiband management employees via email. In these emails, Edwards complained about events in the Bloomington warehouse, focusing on Hiter's "unfair" treatment of her after her return to work. In response to the first email (dated Nov. 9, 2010), Jim Mandel responded via email that he would ask Don Snyder, Vice President of HR, to set up "something" with Edwards as soon as possible and assured her that he would "continue to monitor any changes." There is no evidence as to whether such a meeting ever took place.

The second email was dated January 4, 2011; and was addressed directly to Don Snyder. Again, the email complained about Hiter. The record does not indicate if Snyder responded in any fashion.

IV. TITLE VII RETALIATION

Title VII prohibits employers from retaliating against employees who oppose discriminatory practices. 42 USC §2000e-3(a) states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made unlawful by this subchapter, or because he has … assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.

To prevail on a Title VII retaliation claim[6], a plaintiff must show (1) that she engaged in statutorily protected activity; (2) that she was the object of an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse employment action. *O'Leary v Accretive Health, Inc.*, 657 F3d 625, 630 (7th Cir 2011); *Tomanovich v City of Indianapolis*, 457 F3d 656, 662-63 (7th Cir 2006). Evidence may include both direct and circumstantial evidence proving discriminatory intent. *O'Leary*, 657 F3d at 630-31. Direct evidence would "entail something akin to an admission by the employer," while indirect evidence requires "a convincing mosaic that would permit the same inference without a direct admissions." *Id.* The latter type of evidence would include such things as suspicious timing, ambiguous statements that suggest discriminatory intent; differential treatment of similarly-situated employees; and pretextual reasons for the employer's actions. *Dickerson v Board of Trustees of Community College District No 522*, 657 F3d 595, 601 (7th Cir 2011); *Diaz v Kraft Foods Global Foods Inc.*, 653 F3d 582, 586-87 (7th Cir 2011). Some cases also mention that "significant, unexplained or systematic deviations" from an employer's usual employment practices may contribute to the mosaic of evidence implying intent. See, *Hanners v Trent*, 674 F3d 683, 694 (7th Cir 2012).

Plaintiff in this case expressly states that she bases her retaliation claim on the "opposition" clause. (See Response p. 24). She must therefore demonstrate that she took "some step in opposition to a form of discrimination that the statute prohibits." *O'Leary*, 657 F3d at 631. It is not necessary for a plaintiff to show that there was actual unlawful conduct, *id*, nor must any "magic words" such as "sex discrimination" or "hostile environment" be used. *Miller v American Family Mutual Insurance Co.*, 203 F3d 997, 1008 (7th Cir 2000). Nonetheless, the opposition must have been based on a subjectively sincere and objectively

---

[6] Plaintiff asserts that she is proceeding under the direct method (Response, p.22), so this Opinion does not address the familiar burden-shifting method.

reasonable belief that she was opposing conduct made unlawful by Title VII. *Id; Hatmaker v Memorial Medical Center*, 619 F3d 741, 747 (7th Cir 2010); *Mattson v Caterpillar Inc.*, 359 F3d 885, 890 (7th Cir 2004); *Dey v Colt Construction & Development Co.,* 28 F3d 1446, 1458 (7th Cir 1994). See also, *George v Junior Achievement of Central Indiana, Inc.*, 694 F3d 812, 817 (7th Cir. 2012) (citing *Mattson* for proposition that the "anti-retaliation provision of Title VII does not protect employees who make insubstantial complaints.").

"Opposition" includes communication by an employee to her employer of a belief that the employer has engaged in a form of prohibited discrimination. *Crawford v Metropolitan Government of Nashville and Davidson County, Tennessee*, 555 US 271 (2009). Active resistance is not required; simply answering questions posed by the employer can be sufficient to invoke the statute's protection against retaliation. *Id.*

In *Bowden v. Kirkland & Ellis LLP*, 2010 WL 3526483 (ND Ill), the plaintiff encouraged a co-worker to send a mass email and to file an EEOC charge of race discrimination. When her employment was terminated, she asserted a retaliation claim. The Seventh Circuit's discussion of the facts makes clear that hostility based on interpersonal disputes is not actionable under Title VII. "Merely complaining in general terms about harassment, without identifying a connection to a protected class or providing facts sufficient to create that inference, is insufficient to support a retaliation claim under Title VII." *Id* at *16, citing *Tomanovich*, 457 F3d at 663. Similarly, "mere affiliation" with a complaining coworker or providing "spiritual guidance or friendship" to her is not protected activity. *Bowden*, 2010 WL 3526483 at *17.

On the other hand, the plaintiff in *Bowden* claimed that she had done more: she had consulted with her co-worker in private, urged her to contact a lawyer and file an EEOC charge, and compiled materials that the co-worker used in presenting her EEOC charge. This,

found the Court of Appeals, supported an inference that plaintiff had indeed assisted the co-worker's charge; that was protected activity. *Id*.

The problem in Bowden was that the plaintiff was unable to establish a causal link between this protected activity and the termination of her employment. Specifically, the Court noted that a plaintiff cannot demonstrate the causal nexus when the employer is unaware of the protected activity. Id *at \*18*.

V. DISCUSSION

Defendant asserts (1) that Plaintiff has failed to put forward sufficient evidence that she engaged in protected activity and (2) even if she did, that there is no evidence of a causal link between that activity and the termination of her employment.

A. Protected Activity

The protected activity in which Plaintiff claims to have engaged was her forwarding to Multiband management the Feb. 1, 2011 Silverman email and her sending the January 27, 2011 email to Kretkowski. Defendant asserts that this activity is not protected under Title VII. Plaintiff, of course, disagrees.

First, as to the January 27, 2011 email Hiter sent to Kretkowski, Defendant characterizes this as a 'single comment …of Plaintiff's *subordinate* … that Plaintiff was sleeping with another Multiband employee (a comment which Plaintiff did not even personally hear." [emphasis in original]. Based on this characterization, Defendant naturally concludes that this did not constitute protected activity. Citing *Clark County School District v Breeden*, 532 US 268 (2001), Defendant asserts that no one could reasonably conclude that what Hiter reported in this email was unlawful under Title VII, especially "where the Plaintiff never heard the comment and had the authority to discipline Edwards for allegedly making such a comment."

11

A jury might agree with Defendant's characterization of the email and the inference Defendant would have the court draw therefrom. But that inference is not the only one that can reasonably be drawn. Plaintiff was reporting more than one comment by Edwards – she reported that these types of comments by Edwards had been occurring regularly. She was reporting to her direct supervisor. It is disputed whether Hiter had the authority to discipline Edwards on her own; the record reflects that any discipline had to be approved by someone higher up in management than Hiter was. The record also would allow the inference that such approval was not readily forthcoming, even when Kretkowski was involved.

It is true that the record also reflects ongoing difficulties between Hiter and Edwards that did not involve anything remotely related to Title VII. It would not, however, be unreasonable to view Hiter's motivation for sending the email to Kretkowski as her objection to a subordinate's continuing effort to demean her in a sexual manner in a context where she depended on higher-ups to take appropriate disciplinary action. It cannot be said as a matter of law that this was so insubstantial that it did not constitute protected activity.

Defendant does not challenge in this motion that Hiter believed she was opposing an unlawful practice when she forwarded Silverman's email to upper management and HR. Defendant posits, however, that merely forwarding an email is insufficient to constitute "opposition" within the meaning of the statute. According to Defendant, Title VII extends protection from retaliation to those who "participate" or "assist" in opposing prohibited discrimination; simply forwarding an email is not enough.

As a general rule, Defendant may be correct that the relatively passive act of forwarding an email, at least without more, is not statutory "opposition." In this case, however, where there may have been a clear line that Plaintiff could not cross in disciplining Edwards, she may well have felt that she could do no more than make upper management and Human Resources aware of the ongoing problems Edwards was causing and wait for

their guidance. Hiter did testify that she was waiting to hear from HR before she began to investigate or to interview Silverman, and there is nothing in the record to contradict this testimony.

Hiter's forwarding of Silverman's email must also be considered in a temporal context: she was fired only 8 days after she took that action. Given that timing, as well as the content of the email and the limitations on Hiter's ability to impose discipline on Edwards, it would be incorrect to conclude as a matter of law that Hiter's forwarding of this email did not constitute protected activity.

Finally, with respect to Defendant's assertion that McCreight had made the decision to discharge Hiter *before* she undertook the protected activity, the record does not support drawing that conclusion as a matter of law. McCreight's notes do not clearly indicate that she had made that decision at or immediately following the January 20 meeting. Indeed, nothing in the record reflects her decision until February 5, days *after* the protected activity occurred. There is a dispute of fact as to this issue as well.

I conclude that the record reflects disputed facts that prevent a finding that Plaintiff did not engage in protected activity. Summary judgment cannot be granted on that ground.

B. Causal Link

Defendant also asserts that there is no causal link between the alleged protected activity and the decision to discharge Hiter. This raises an immediate obvious question: how can Defendant challenge the causal link, when the very Notice of Termination cites to one of the emails as the basis for the discharge?

Defendant attempts to short circuit that apparent connection by asserting that McCreight's testimony establishes that she had already made a decision on January 20, 2011 to make a change the management at the warehouse. It does not establish that. McCreight's notes following her January 20, 2011 meeting at the warehouse said absolutely nothing about

13

discharging Hiter; it was not until she forwarded those notes several weeks later – and after the Kretkowski email had been sent and the Silverman email forwarded - that discharge was mentioned.

Determining credibility is a job for the jury, not for the Court on summary judgment. Summary judgment cannot be granted on this basis.

VI. CONCLUSION

For reasons stated herein, the motion #24 to amend is GRANTED, and the Clerk is directed to file the amended Response attached to motion #24, The motion #17 for summary judgment is DENIED. The final pretrial conference currently set on Monday, February 4, 2013 at 1:30 PM is CANCELLED and RESET to Thursday, February 21, 2013 at 10:30 AM in person in chambers in Peoria. The court sets a deadline of February 8, 2013 for filing of motions in limine and February 15, 2013 for filing of responses. The proposed final pretrial order, with all attachments including jury instructions, shall be filed on or before February 18, 2013.

ENTERED: January 24, 2013

                              s/ John A. Gorman

                              JOHN A. GORMAN
                      UNITED STATES MAGISTRATE JUDGE